William R. Overend (SBN 180209)
Email: woverend@reedsmith.com
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111-3922

**Mailing Address:**
P.O. Box 7936
San Francisco, CA 94120-7936

Telephone:   +1 415 543 8700
Facsimile:   +1 415 391 8269

Emily B. Kirsch
Email: ekirsch@reedsmith.com
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Telephone:   +1 212 521 5400
Facsimile:   +1 212 521 5450

Attorneys for Plaintiff
The Orchard Enterprises, Inc.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ORCHARD ENTERPRISES, INC., a Delaware corporation,<br><br>            Plaintiff,<br><br>vs.<br><br>TUFAMERICA, INC., a New York corporation,<br><br>            Defendant. | No.:<br><br>**COMPLAINT**<br><br>**[JURY TRIAL DEMANDED]** |

Plaintiff, The Orchard Enterprises, Inc. ("The Orchard"), formerly known as Digital Music Group, Inc., alleges as follows:

## PRELIMINARY STATEMENT

1. This is a diversity action against Defendant TufAmerica, Inc. ("TufAmerica") for fraudulent inducement, breach of contract, breach of the covenant of good faith and fair dealing, and related common law and state law claims, and for declaratory judgment under the Declaratory Judgment Act 28 U.S.C. § 2201, *et seq*.

2. In 2005, The Orchard, a distributor and marketer of audio and video recordings to retailers, entered into negotiations with TufAmerica concerning rights to audio recordings which TufAmerica purported to own, license or control. TufAmerica promised that it could deliver at least 11,000 audio recordings of good commercial and musical quality in an agreed group of genres. After extensive negotiations, and in reliance on TufAmerica's promises, The Orchard entered into a written agreement with TufAmerica in 2006, pursuant to which The Orchard would pay over $2 million for the rights to distribute and sell the 11,000 audio tracks promised by TufAmerica.

3. Although The Orchard upheld its side of the bargain and paid the agreed-upon amounts, TufAmerica has not kept its end of the bargain and has not performed its obligation of delivering the tracks. Rather, TufAmerica deceived The Orchard by promising to deliver good commercial tracks but instead delivering tracks that were largely defective or otherwise useless. Specifically, most of the 11,000 tracks TufAmerica sent The Orchard were "junk" tracks – false starts, incomplete songs, corrupt files, out-takes, duplicates, multiple versions of the same songs and songs in the wrong genres. Out of all of the audio recordings TufAmerica sent to The Orchard under the agreement, only a few thousand were acceptable under the terms of the agreement.

4. Having fraudulently induced The Orchard to pay more than $2 million for mostly worthless recordings, TufAmerica now refuses either to replace the junk tracks it sent The Orchard with audio recordings of good commercial and musical quality in the agreed group of genres, or to provide The Orchard with a pro-rata refund for the "junk" tracks it sent The Orchard, as provided in the parties' agreement.

5. Instead, TufAmerica has demanded even more money from The Orchard for more "junk" tracks recently delivered pursuant to an option clause in the parties' written agreement.

When The Orchard refused to pay more money for the additional "junk" tracks, TufAmerica purported to terminate the agreement.

6. The Orchard has been damaged by TufAmerica's fraudulent acts and its numerous breaches of contractual, common law and statutory duties, and The Orchard thus seeks an award of compensatory and punitive damages.

7. In the alternative, The Orchard seeks rescission of the agreement between The Orchard and TufAmerica and a return of all consideration The Orchard paid to TufAmerica in connection therewith.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332. The amount in controversy exceeds the sum of $75,000, exclusive of interests and costs, and the parties are citizens of different states.

9. Venue is proper pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise to the claims in this action occurred in this judicial district and because by contract, the parties stipulated to jurisdiction and venue in this judicial district.

## PARTIES

10. The Orchard is a Delaware Corporation with a principal place of business at 2151 River Plaza Drive, Suite 200, Sacramento, California. The Orchard is a content owner and leading distributor and marketer of music and video recordings.

11. Defendant TufAmerica is a New York Corporation with it principal place of business at 250 West 49th Street, New York New York. TufAmerica is in the business of producing, acquiring and licensing audio recordings.

## FACTUAL BACKGROUND

A.  <u>The Negotiations and TufAmerica's Intentional Misrepresentations</u>

12.  From mid-2005 through September 12, 2006, representatives of The Orchard engaged in lengthy negotiations with representatives of TufAmerica regarding the exclusive, perpetual worldwide licensing by The Orchard of digital rights in certain audio recordings purportedly owned, licensed to or otherwise controlled by TufAmerica.

13.  The negotiating representatives of TufAmerica included its founder and CEO, Aaron Fuchs, as well as Jeff Gandel, in-house counsel for TufAmerica.

14.  The negotiating representatives of The Orchard included Peter Koulouris, The Orchard's former Vice President of Business Development and Scott Hervey, outside counsel to The Orchard.

15.  During this period, numerous misrepresentations were made by representatives of TufAmerica to The Orchard regarding the quantity, genre and quality of the audio recordings TufAmerica owned, licensed or controlled and could license to The Orchard.

16.  For example, on multiple occasions from mid-2005 through September 12, 2006, TufAmerica representatives misrepresented that TufAmerica would own, have licenses to or otherwise control and be able to license and would provide to The Orchard initially at least 11,000 and ultimately as many as a total of 20,000 master audio recordings of good commercial and musical quality which were: (a) in an agreed set of genres – namely, vintage jazz, blues, funk, soul and "urban" recordings; and (b) technically and mechanically fit.  These false representations were made by Mr. Gandel and other TufAmerica representatives to The Orchard representatives, including Mr. Hervey.

17.  In addition, on multiple occasions from mid-2005 through September 12, 2006, TufAmerica misrepresented that the 8,000 master audio recordings it proposed to deliver subsequent to an initial 3,000 master recordings (together comprising the initial 11,000 tracks promised), as well as up to another 9,000 master audio recordings delivered at TufAmerica's option (*See* Paragraph 24,

*infra*) would be of commercial and musical quality comparable to that of the initial 3,000 master audio recordings it delivered. These false representations were made by Mr. Gandel and other TufAmerica representatives to The Orchard representatives, including at least Mr. Hervey.

18. The foregoing misrepresentations by TufAmerica were false, were known by TufAmerica to be false and misleading when made, and were intended to induce The Orchard to enter into a licensing agreement with TufAmerica for at least 11,000 and as many as 20,000 technically and mechanically fit master audio recordings of an agreed set of genres and of good commercial and musical quality.

19. Despite these and other similar representations, upon information and belief, TufAmerica never owned, licensed or otherwise controlled the promised group of at least 11,000 technically and mechanically fit master audio recordings of good commercial and musical quality in an agreed set of genres, and never intended to provide at least 11,000 and as many as 20,000 master audio recordings of good commercial and musical quality in an agreed set of genres to The Orchard pursuant to any agreement entered into by The Orchard and TufAmerica.

B. The Digital Distribution Agreement

20. In reliance on the foregoing intentional misrepresentations by TufAmerica, on or about September 12, 2006, The Orchard entered into a Digital Distribution Agreement (the "Agreement") with TufAmerica, pursuant to which TufAmerica granted to The Orchard perpetual rights to sell and distribute, through digital channel outlets such as electronic transmissions and similar means, initially at least 11,000 and up to 20,000 master audio recordings comprised of an agreed set of genres. A true and correct copy of the Agreement is attached hereto as Exhibit A.

21. Under the Agreement, the "Masters" to be delivered by TufAmerica to The Orchard are defined as "eleven thousand master audio recordings comprised of vintage jazz, blues, funk, soul and 'urban' recordings, including original recordings by Ray Charles and Queen Latifa (but specifically excluding any 'sound alike' recordings), which, in TufAmerica's reasonable opinion are of good commercial and musical quality...." *Exhibit A at ¶1.*

– 5 –
Complaint

22. Under the Agreement, TufAmerica was to deliver at least 3,000 of the Masters by December 12, 2006 and was to deliver the additional 8,000, together with all necessary artwork and metadata, by no later than nine months from December 12, 2006. *See Exhibit A at page 1 and ¶2.4.*

23. Under the Agreement, each of the 11,000 "Masters" is required to be owned, controlled by or licensed to TufAmerica as of September 12, 2006. *See Exhibit A at ¶1.*

24. In addition, under the Agreement, TufAmerica was granted an option to deliver to The Orchard for sale and distribution under the same terms and conditions as the Masters up to an additional 9,000 master audio recordings. *Exhibit A at ¶11.* These additional master audio recordings ("Option Masters") are defined as "those nine thousand (9,000) master audio recordings comprised of vintage jazz, blues, funk, soul and 'urban' recordings, (but specifically excluding and 'sound alike' recordings)...." *Exhibit A at ¶1.*

25. Under the Agreement, the musical quality and commercial prospects of the Option Masters is to be "reasonably similar to the musical quality and commercial prospects of the Masters." *Exhibit A at ¶1.*

26. In addition, the Agreement provided that TufAmerica would also provide all related album and promotional artwork, negatives, photographs, album covers and textual material and name and likeness materials that is in TufAmerica's possession and control and which have previously been released to the public by TufAmerica (the "Artwork") and metadata containing all information for processing the Masters and Option Masters by The Orchard, including, but not limited to song title, artist name, songwriter and publisher information (the "Metadata") associated with for each Master or Option Master delivered by TufAmerica. *Exhibit A at ¶¶ 2.2, 2.4(c) and Exhibit B thereto.* Delivery of a Master under the Agreement is not completed until all Artwork and Metadata is delivered to The Orchard by TufAmerica.

27. Under the Agreement, each Master and associated Metadata and Artwork provided by TufAmerica was to be complete, in the proper format, technically and mechanically fit, and in the vintage jazz, blues, funk, soul or "urban" genres. *Exhibit A at ¶2.7(a).* To the extent the Masters were not (a) technically or mechanically fit or (b) not of the approved genres, The Orchard was allowed to send an "Examination Notice" and TufAmerica agreed to replace the insufficient Master

or reduce the Advance and Licensing Fee payable to TufAmerica. *Id.* If TufAmerica failed to provide suitable replacements for such rejected Masters, The Orchard was entitled under the Agreement to a pro rata reduction in the fees payable to TufAmerica. *Exhibit A at ¶2.7.*

28. In consideration of the Agreement, and in reliance on TufAmerica's representations and warranties to The Orchard regarding the genres, quantity and commercial and musical quality of the Masters and Option Masters in advance of execution of the Agreement by TufAmerica, The Orchard agreed under Paragraphs 4.1(a) and 4.2(a)-(b) to pay to TufAmerica an advance against future royalties (the "Advance") plus a licensing fee (the "Licensing Fee").

29. The Orchard paid the Advance and Licensing Fee for 11,000 Masters as provided for in the Agreement in full, in stages pursuant to the terms of the Agreement, following periodic deliveries of purported Masters by TufAmerica.

30. The total Licensing Fee paid by The Orchard to TufAmerica under the Agreement by July 11, 2007 was $815,259.00.

31. The total Advance against future royalties paid by The Orchard to TufAmerica under the Agreement by July 11, 2007 was $1,630,541.00.

C. <u>TufAmerica's Breaches</u>

32. The first group of approximately 3,000 tracks delivered by TufAmerica met many of the requirements of Masters under the Agreement, although they included some duplicate and redundant or otherwise inadequate audio recordings.

33. Thereafter, however, the majority of the tracks delivered by TufAmerica failed to satisfy the requirements of Masters under the Agreement.

34. Of the 8,720 subsequent tracks delivered by TufAmerica to The Orchard on and prior to June 11, 2007, approximately 4,700 did not qualify as Masters under the Agreement, because they did not meet the requirements of the Agreement.

35. Instead, TufAmerica, as it had intended all along but unknown to The Orchard, sent The Orchard hundreds of incomplete songs, with false starts and dropped ends; hundreds more

tracks that were complete duplicates, hundreds more that were not of the agreed genres; and almost a thousand tracks of such poor quality that they were simply not saleable.

36. TufAmerica also sent The Orchard over 2,000 tracks that were completely redundant – two versions, three versions, even five and six versions of the same song by the same artist. TufAmerica wanted The Orchard to count each of these as a separate Master.

37. Upon information and belief, TufAmerica sent The Orchard whatever tracks it had in its possession, without regard to quality or commercial viability, and not just finished commercial quality audio recordings.

38. Despite The Orchard's demands, and in violation of its contractual obligations under the Agreement, TufAmerica has refused to provide additional Masters to replace the non-conforming audio recordings, and has refused to provide a pro-rata reduction of the Advance and License Fees paid by The Orchard under the Agreement.

39. Out of the original approximately 11,000 audio recordings sent by TufAmerica to The Orchard, only around 7,000 conceivably met the requirements of the Agreement.

40. On or about October 3, 2007, TufAmerica sent The Orchard an additional 1,838 audio recordings, which TufAmerica purported to be Option Masters under the Agreement.

41. Of those purported 1,838 Option Masters, fewer than 800 met the requirements of the Agreement. The other tracks were, once again, mostly junk – incomplete, false starts, duplicates, of poor audio quality or of the wrong genres.

42. TufAmerica has refused to allow those less than 800 acceptable audio recordings sent in October, 2007 as Option Masters to be considered as Replacement Masters under the Agreement, and has demanded additional payment from The Orchard for all 1,838 audio recordings it sent to The Orchard in October, 2007.

43. On or about December 11, 2007, TufAmerica sent The Orchard an additional 9,593 audio recordings, which TufAmerica purported to be Option Masters under the Agreement.

44. Of these purported 9,593 Option Masters, fewer than 1,500 met the requirements of the Agreement. The other tracks were, once again, mostly junk – incomplete, duplicates, missing metadata, un-encodable, of poor audio quality or of the wrong genre.

45. TufAmerica has refused to allow those less than 1,500 acceptable audio recordings sent as Option Masters in December, 2007 to be considered as Replacement Masters under the Agreement, and has demanded additional payment from The Orchard for all 9,593 audio recordings it sent to The Orchard in December, 2007.

46. Overall, out of the approximately 23,000 audio recordings sent by TufAmerica to The Orchard under the Agreement as either purported Masters or Option Masters, only around 9,000 tracks meet the requirements of Masters under the Agreement, far less than the 11,000 Masters already paid for by The Orchard under the Agreement.

47. Despite not having delivered as many Masters as it has already been paid for, even counting as Masters the acceptable purported Option Masters, TufAmerica has demanded payment of an additional $1,259.858.00 for the purported Option Masters it has delivered to The Orchard.

48. TufAmerica refuses to deliver more acceptable Masters, to consider any of the acceptable purported Option Masters as Masters or to provide The Orchard with an appropriate pro rata reduction in Advance and Licensing Fees already paid by The Orchard.

49. The Orchard has declined to pay additional monies for the purported Option Masters sent to The Orchard by TufAmerica, for the reasons set forth above.

50. On or about January 17, 2008, TufAmerica purported to terminate the Agreement, effective as of January 27, 2008, due to The Orchard's refusal to pay additional monies for the purported Option Masters sent by TufAmerica to The Orchard.

51. TufAmerica's purported termination placed The Orchard under an immediate threat of litigation if The Orchard continued to attempt to commercially exploit the limited number of Masters it obtained from TufAmerica under the Agreement. Defendant TufAmerica did not, however, even return the Advance against royalties and the License Fee, despite the fact it purported to deprive The Orchard of the right to make sales that might give rise to such royalties.

52. Although The Orchard believes the termination to be invalid, in an abundance of caution, it has presently removed all of the tracks it acquired from TufAmerica from its site and is no longer offering any of them for sale.

53. Accordingly, despite having more than paid TufAmerica in full, The Orchard is presently unable to sell any of the Masters, and is thereby further being denied the benefit of the bargain with TufAmerica.

## FIRST CLAIM FOR RELIEF

**(Fraud in the Inducement – California Statutory and Common Law)**

54. The Orchard repeats the allegations in the foregoing paragraphs as if fully set forth herein.

55. At and/or prior to the time that The Orchard and TufAmerica entered into the Agreement, TufAmerica, through Mr. Gandel and/or others, represented to The Orchard in words or substance, among other things, that TufAmerica would perform the above-described obligations set forth in the Agreement. Among other things, knowing that such representations were false, TufAmerica represented that it would own, have licenses to or otherwise control and be able to license and provide to The Orchard at least 11,000 initially and ultimately as many as a total of 20,000 master audio recordings of good commercial and musical quality which were: (a) in an agreed set of genres – namely, vintage jazz, blues, funk soul and "urban" recordings; and (b) technically and mechanically fit. The Orchard is informed and believes and thereon alleges that those persons negotiating the Agreement for TufAmerica, including but not limited to Mr. Gandel, at the time of making the representations herein alleged, were acting within the course and scope of their employment and authority for TufAmerica.

56. The aforementioned promises and representations were made by TufAmerica to The Orchard in order to induce The Orchard to enter into the Agreement.

57. The foregoing promises and representations were made without any intention by TufAmerica of performing them. Each such promise and representation was made to The Orchard in bad faith and with the intent that The Orchard act on it by entering into and commencing performance under the Agreement.

58. Statements made by TufAmerica at or prior to the time that The Orchard and TufAmerica entered into the Agreement regarding the quantity, quality and genre of the audio recordings it owned, licensed or controlled and would deliver to The Orchard under the Agreement

were false when made. TufAmerica knew or reasonably should have known that each such false statement was false and fraudulent when made, and/or with knowledge that the statements omitted material facts necessary to make the statements not misleading. In making such representations and promises, TufAmerica failed to reveal and suppressed the facts that TufAmerica did not own, have license to or otherwise control the quantity of acceptable Masters offered to The Orchard, and instead had primarily audio recordings which were duplicates, rough takes, demos, incomplete, technically deficient, false starts, and/or of wrong genres, which facts were known to TufAmerica at all times.

59. TufAmerica's misrepresentations and omissions were made with the intent of misleading or inducing The Orchard to act on and rely on these misrepresentations and/or omissions in entering into the Agreement.

60. TufAmerica's false statements and/or omission were material.

61. The Orchard, at the time these promises were made by TufAmerica, and at the time The Orchard took the actions herein alleged, was unaware of the falsity of these representations and believed them to be true. In reasonable and justifiable reliance on those representations, The Orchard was induced to and did enter into the Agreement, and paid the sum of $2,445,800.00 to TufAmerica pursuant to the Agreement. Had The Orchard known the actual facts, it would not have taken such action. The Orchard's reliance on TufAmerica's representations was justified because it could not, in the exercise of reasonable diligence, have discovered the truth regarding TufAmerica's misrepresentations and/or omissions.

62. The aforementioned conduct of TufAmerica was an intentional misrepresentation, deceit, or concealment of a material fact known to TufAmerica with the intention on the part of TufAmerica of thereby depriving The Orchard of property or legal rights or otherwise causing injury, in violation of California statutory and common law.

63. The acts, omissions, representations and concealments of TufAmerica identified above were intentional, malicious and oppressive in nature and were effected with a conscious and reckless disregard for The Orchard's rights. As a direct and proximate result of the foregoing, The Orchard has been damaged in an amount to be proven at trial. Such conduct by TufAmerica thus

constitutes despicable conduct and The Orchard is entitled to recover punitive and exemplary damages in an amount to be proven at trial.

WHEREFORE, The Orchard prays for relief as set forth below.

## SECOND CLAIM FOR RELIEF

### (Negligent Misrepresentation — Cal. Civ. Code § 1710(2))

64. The Orchard repeats the allegations in the foregoing paragraphs as if fully set forth herein.

65. TufAmerica made numerous representations and promises to The Orchard, including those referenced in the foregoing paragraphs, and specifically including the representations that TufAmerica could deliver acceptable Masters and Option Masters to The Orchard in the manner represented by TufAmerica and relied upon by The Orchard.

66. The Orchard is informed and believes and thereon alleges that those persons negotiating the Agreement for TufAmerica, including but not limited to Jeff Gandel, at the time of making the representations herein alleged, were acting within the course and scope of their employment and authority for TufAmerica.

67. The representations made by TufAmerica were in fact false. Contrary to TufAmerica's representations and promises, TufAmerica did not own, have license to or otherwise control and could not deliver the specified numbers of acceptable Masters and Option Masters to The Orchard as represented and promised.

68. When TufAmerica made the foregoing representations and promises, it had no reasonable ground for believing them to be true.

69. TufAmerica made those representations with the intention of inducing The Orchard to act in reliance on those representations in the manner herein alleged, or with the expectation that The Orchard would so act.

70. The Orchard, at the time these representations were made by TufAmerica and at the time The Orchard took the actions herein alleged, was unaware of the falsity of TufAmerica's representations and believed them to be true. In reliance on those representations, The Orchard was

induced to and did enter into the Agreement, made payment in full to TufAmerica pursuant thereto and continued to attempt to fix problems with the flawed Masters and Option Masters. Had The Orchard known the actual facts, it would not have taken such action. The Orchard's reliance on TufAmerica's representations was justified because it could not, in the exercise of reasonable diligence, have discovered the truth regarding TufAmerica's misrepresentations concerning acceptable Masters and Option Masters.

71. As a direct and proximate result of the negligent conduct of TufAmerica, The Orchard has been damaged in an amount to be proven.

72. The aforementioned conduct of TufAmerica was negligent misrepresentation of material facts in violation of California Civil Code Sections 1710(2) and common law.

73. The Orchard is informed and believes and thereon alleges that TufAmerica perpetrated the above acts in a knowing, oppressive, willful, malicious and fraudulent manner, and with the intent and purpose of advancing their own gain at the expense of The Orchard's rights and interests. As a result, The Orchard is entitled to punitive and exemplary damages.

WHEREFORE, The Orchard prays for relief as set forth below.

### THIRD CLAIM FOR RELIEF
### (Breach of Contract)

74. The Orchard repeats the allegations in the foregoing paragraphs as if fully set forth herein.

75. The Agreement provides that TufAmerica would deliver 11,000 Masters and could deliver an additional 9,000 Option Masters. The Agreement also provides that if TufAmerica fails to provide replacement Masters for unacceptable Masters or if The Orchard rejects the offered replacement Masters, The Orchard shall be entitled to a pro rata reduction in Advance and Licensing fees payable to TufAmerica as a cure for such failure.

76. TufAmerica breached the Agreement, among other ways, by failing to deliver 11,000 acceptable Masters and by failing to cure.

77. TufAmerica further breached the Agreement by its purported and unfounded termination of the Agreement, depriving The Orchard of the benefit of the bargain even as to the limited number of acceptable Masters provided by TufAmerica.

78. TufAmerica breached the express warranty contained in Section 6(g) of the Agreement in that, among other things, many of the purported Masters, Option Masters, Metadata and Artwork sent by TufAmerica to The Orchard are not technically satisfactory.

79. The Orchard has performed all conditions, covenants and promises required by it on its part to be performed in accordance with the terms and conditions of the Agreement, except as to those conditions which have been excused.

80. As a direct and proximate result of TufAmerica's breach of the Agreement, The Orchard has been damaged in an amount to be proven at trial, which is no less than the Licensing Fee and Advance already paid to TufAmerica in the amount of $2,445,800.00.

WHEREFORE, The Orchard prays for relief as set forth below.

### FOURTH CLAIM FOR RELIEF

**(Breach Of Covenant of Good Faith and Fair Dealing)**

81. The Orchard repeats the allegations in the foregoing paragraphs as if fully set forth herein.

82. The Agreement between The Orchard and TufAmerica contained and included the implied covenant of good faith and fair dealing that required, among other things, that TufAmerica do nothing to deprive The Orchard the benefits of the Agreement.

83. TufAmerica breached the foregoing implied covenant by, among other things, engaging in the misconduct described above and hereafter, including but not limited to TufAmerica's refusal to treat acceptable purported Option Masters as Replacement Masters and TufAmerica's purported termination of the Agreement. As a result of this misconduct, The Orchard has been deprived of the benefits of distribution rights it paid for under the Agreement.

84. As a direct and proximate result of the foregoing, The Orchard has been damaged in an amount to be proven at trial.

WHEREFORE, The Orchard prays for relief as set forth below.

## FIFTH CLAIM FOR RELIEF

### (Unjust Enrichment)

85. The Orchard repeats the allegations in the foregoing paragraphs as if fully set forth herein.

86. The Orchard paid an Advance and Licensing Fees for Masters which were never delivered to TufAmerica in the amount of $2,445,800.00 in addition to other payments that The Orchard paid to TufAmerica. TufAmerica kept those fees without providing the contracted for goods to The Orchard. Under the circumstances, it would be inequitable to allow TufAmerica to keep the fees that are properly due to The Orchard.

87. As a direct and proximate result of its receipt of fees properly belonging to The Orchard, TufAmerica unjustly enriched itself in an amount to be proven at trial.

WHEREFORE, The Orchard prays for relief as set forth below.

## SIXTH CLAIM FOR RELIEF

### (Violations of Business & Professions Code §§ 17200 et. seq.)

88. The Orchard repeats the allegations in the foregoing paragraphs as if fully set forth herein.

89. Among other things, TufAmerica's act of entering into the Agreement to provide an acceptable quantity of Masters it never actually had or intended to provide was unfair, fraudulent and deceptive.

90. By committing the acts and practices alleged above, TufAmerica has been and continues to be engaged in unfair and/or deceptive business practices within the meaning of the Business & Professional Code §§ 17200 et. seq.

91. The Orchard has been injured in fact and has lost money and property as a result of TufAmerica's unfair business practices as alleged throughout this Complaint.

92. TufAmerica, through its acts of unfair and deceptive business practices, has obtained a value as a direct result of its scheme in an amount to be proven at trial.

93. The Orchard is entitled to recover amounts by which TufAmerica has been unjustly enriched from its unlawful and unfair business acts and practices of unfair competition.

94. By reason of the foregoing, TufAmerica has violated Sections 17200, et seq., of the California Business and Professions Code.

WHEREFORE, The Orchard prays for relief as set forth below.

## SEVENTH CLAIM FOR RELIEF

### (Rescission Pursuant to Cal. Civil Code Section 1689)

95. The Orchard repeats the allegations in the foregoing paragraphs as if fully set forth herein.

96. In the event that the Agreement between The Orchard and TufAmerica is otherwise valid or enforceable, The Orchard's consent to enter into that Agreement was obtained as a result of TufAmerica's fraud as described hereinabove, and/or by a mistake of sufficient materiality to enable The Orchard, as a matter of law, to rescind that agreement.

97. Moreover, as a result of the above-referenced misrepresentations, omissions, warranties and other acts and conduct of TufAmerica, the consideration to be received by The Orchard as a part of any such agreement has failed in material respects.

98. By this Complaint, The Orchard provides notice of rescission to TufAmerica and offers to restore any consideration received from TufAmerica on the condition that TufAmerica do likewise and that the equities among the parties be otherwise properly adjusted.

99. As a direct and proximate result of the foregoing, The Orchard has been damaged in an amount to be proven at trial.

WHEREFORE, The Orchard prays for relief as set forth below.

# EIGHTH CLAIM FOR RELIEF

## (Declaratory Judgment)

100.  The Orchard repeats the allegations in the foregoing paragraphs as if fully set forth herein.

101.  An actual controversy has arisen and now exists between The Orchard and TufAmerica concerning their respective rights and duties. The Orchard has paid the Advance and Licensing Fee in full for 11,000 Masters as defined in the Agreement and has otherwise performed under the Agreement, and contends that it is entitled to either (a) the full 11,000 acceptable Masters from TufAmerica or (b) a pro-rata refund from TufAmerica for the quantity of acceptable Masters TufAmerica is unable or unwilling to deliver to The Orchard. TufAmerica disputes this contention and refuses to provide either (a) the full 11,000 acceptable Masters from TufAmerica or (b) a pro-rata refund from TufAmerica for the quantity of acceptable Masters TufAmerica is unable or unwilling to deliver to The Orchard, and has further purported to terminate the Agreement based on an alleged breach by The Orchard.

102.  The Orchard desires a judicial determination of its rights and duties, and a declaration that TufAmerica is required to provide either (a) the full 11,000 acceptable Masters from TufAmerica or (b) a pro-rata refund from TufAmerica for the quantity of acceptable Masters TufAmerica is unable or unwilling to deliver to The Orchard. The Orchard further desires the judicial determination and declaration that The Orchard has not breached the Agreement and that TufAmerica's purported unilateral termination of the Agreement is invalid.

103.  Such a declaration is necessary and appropriate at this time pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, in order that the parties may ascertain their respective rights and duties.

WHEREFORE, The Orchard prays for relief as set forth below.

# PRAYER FOR RELIEF

WHEREFORE, The Orchard prays for judgment against TufAmerica as follows:

a. That judgment be entered in favor of The Orchard and against TufAmerica on all counts;

b. That the Court award compensatory damages in an amount according to proof but not less than $2,445,800.00, including but not limited to all actual, out-of-pocket, overhead or other expenses, costs, damages and losses suffered and incurred or to be suffered and incurred, and all lost profits and earnings resulting from the acts alleged in this Complaint;

c. That the Court award to The Orchard all sums by which TufAmerica has been unjustly enriched as the result of its wrongful conduct alleged herein;

d. That the Court order TufAmerica to pay as restitution to The Orchard all sums both gained by TufAmerica and lost by The Orchard as a result of TufAmerica's unfair competition in violation of California law;

e. That the Court enter an order: (1) rescinding the Agreement between The Orchard and TufAmerica; (2) directing TufAmerica to provide restitution to The Orchard of any benefits conferred on TufAmerica or obtained by them; and (3) awarding all recoverable consequential and other damages, including but not limited to an amount sufficient to restore The Orchard to the position it would have been in but for the actions and events described in this Complaint;

f. That the Court enter an order declaring that TufAmerica is required to provide either (a) the full 11,000 acceptable Masters from TufAmerica or (b) a pro-rata refund from TufAmerica for the quantity of acceptable Masters TufAmerica is unable or unwilling to deliver to The Orchard, and further declaring that The Orchard has not breached the Agreement and that TufAmerica's purported termination of the Agreement is invalid.

g. For punitive and exemplary damages in an amount according to proof;

h. For interest on all recoverable damages at the highest legal rate from the earliest possible date;

i. For attorneys' fees and costs incurred in connection with this action to the fullest extent permitted by law; and

j.      For such other and further relief as this Court may deem just and proper for The Orchard's benefit.

DATED: March 11, 2008.

REED SMITH LLP

By /s/ William R. Overend
William R. Overend

Attorneys for The Orchard Enterprises, Inc.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff The Orchard hereby demands a jury trial as to all triable claims in this action.

DATED: March 11, 2008.

REED SMITH LLP

By _____
William R. Overend

Attorneys for The Orchard Enterprises, Inc.